117 So.2d 610 (1960)
Newton B. POWELL, Jr., Plaintiff-Appellee,
v.
TRAVELERS INSURANCE COMPANY et al., Defendants-Appellants.
No. 9117.
Court of Appeal of Louisiana, Second Circuit.
January 26, 1960.
Rehearing Denied February 15, 1960.
Certiorari Denied March 23, 1960.
*611 D. T. Methvin, Jr., Alexandria, W. Peyton Cunningham, Natchitoches, for appellants.
Watson, Williams & Brittain, Natchitoches, for appellee.
AYRES, Judge.
This is an action for workmen's compensation wherein plaintiff seeks to recover of his former employer and his insurer compensation at the maximum statutory rate as for total and permanent disability, and, of the insurer, penalties and attorney's fees, less compensation previously paid covering a period of 66 weeks, because of accidental injuries received by him June 26, 1957, while performing services in the drilling of an oil and/or gas well near Kinder, Louisiana.
That plaintiff sustained accidental injuries in the course and scope of his employment and while discharging the duties thereof is conceded by the defendants. The defense is that plaintiff had completely recovered from the injuries sustained by him and was fully capable of returning to and discharging the duties of his former occupation as of October 2, 1958, when payment of compensation was terminated. From a judgment awarding plaintiff compensation as prayed for, but rejecting his demands for penalties and attorney's fees, defendant appealed. Plaintiff has answered the appeal, praying that the judgment be amended by the allowance of such penalties and attorney's fees, and by increase of award for future medical expenses.
When accidentally injured, plaintiff was employed as a "roughneck" by J. P. Owen, d. b. a. Owen Drilling Company, performing services as a "lead-tong man" in the operation of a drilling rig in search for oil, gas and/or other minerals. A "roughneck" has been defined as a laborer who, under the supervision and direction of a superior known as a driller, engages in "rigging up," or installing, and operating drilling rigs in the search and exploration for the above-enumerated minerals. Cotton v. Hartford Accident & Indemnity Company, La.App., 116 So.2d 736.
As generally recognized and as the evidence in this case establishes, the work of a roughneck constitutes hard, manual labor, consisting, among other things, of the lifting and carrying of heavy loads, or weights, climbing ladders and derricks, working with or in close proximity to fastmoving power machinery, and working on *612 wet or slippery derrick floors, elevated as much as 15 to 17 feet above ground, and reached by long flights of steps, or stairs. Frequently, the heavy loads referred to must be borne either up or down stairs, or while climbing ladders or derricks. In addition to the aforesaid, a lead-tong man is charged with a duty of "stabbing" pipe, that is, catching, with tongs, the lower end of a string of pipe suspended near the top of a derrick, as it is swung into place across the derrick floor, in order that it may be guided to its proper location and position for connection with other drill pipe, bit, or Kelly joint already in the "hole," or well. In the performance of these duties, it is obvious that the laborer must not only be skilled and experienced in the tasks undertaken, but that he must be constantly alert and possess a remarkable degree of agility to assure efficiency in his work and safety to himself and fellow employees.
The facts of the occurrence of the accident in which plaintiff was involved and upon which is predicated his claim may be briefly stated. On leaving the derrick floor to measure the length of a drill pipe on the ground, in preparation for its immediate use, plaintiff started down a flight of steps when, on reaching either the first or second step from the top, he slipped and fell over the side of the steps, which were unprotected by handrail, to the ground, a distance of approximately 14 feet. Plaintiff landed on his feet, his left foot catching his weight and absorbing the momentum of the fall and striking a metal cap or casing protector. As a result of this accident, plaintiff sustained severe and painful injuries consisting principally of the fracture of the second, third, and fourth metatarsals of the left foot, as well as sprains and contusions of the muscles, tissues, and ligaments thereof.
Treatment was first administered plaintiff by Dr. Mays of the Kinder Clinic, but, due to the seriousness and the enormity of the emergency caused by Hurricane "Audrey," plaintiff was returned to his father's residence at Ashland, after which he was examined by Dr. L. E. L'Herisson, a general practitioner of Coushatta, who immediately referred him to Dr. E. C. Simonton, an orthopedist of Shreveport.
Dr. Simonton's examination and treatment of plaintiff began June 28, 1957, when physical examination revealed a marked generalized swelling about the left foot, with tenderness over the forefoot and over the bases of the metatarsals. X-rays disclosed a fracture of the neck of the second metatarsal, with marked angulation at the fracture site, and fractures at the bases of the third and fourth metatarsals. An open reduction of the second metatarsal was performed and a Steinman pin placed in that bone in order to afford some degree of stability to the affixation of that bone. As of August 9, 1957, the callus formation and the union of the fracture of the second metatarsal were insufficient to permit weight bearing on the foot. Union was sufficient, however, for the removal of the internal fixation and plaster immobilization. Accordingly, on that date, the Steinman pin was removed and an elastic bandage applied.
On August 30, 1957, plaintiff returned to Dr. Simonton, complaining of the continuance of pain and swelling in his left foot. Nevertheless, plaintiff was able to ambulate on crutches without difficulty. X-rays, taken at that time, indicated continued healing or consolidation at the fracture sites, the lines of which, however, remained clearly visible. An elastic stocking, or bandage, was recommended for use while using crutches. Although healing of the fractures was slow, difficulty was neither indicated nor anticipated. Noted, however, was a bony prominence at the bases of the metatarsals at the fracture sites in the third and fourth metatarsals. This formation, at the time, was considered neither disabling, injurious, nor excessive.
On October 1, 1957, plaintiff remained on crutches, unable to wear a shoe on his left foot. On further examination, there was found slight tenderness at the fracture site *613 of the second metatarsal, as well as a moderate tenderness on the anterior lateral surface of the foot. The fracture having continued to satisfactorily heal, plaintiff was advised to begin weight bearing with crutch ambulation but to discontinue the use of crutches after a period of two weeks.
Plaintiff returned for further examination and treatment, as was suggested, October 29, 1957, when he continued to complain of pain under the bony prominence on the outside of his foot, and with trouble in bending his toes. A physical examination on that occasion revealed some tenderness on pressure over the fracture site of the second metatarsal and some restriction of flexion of the second and third toes. Irritation and tenderness were found on the bony prominence of the junction of the tarsals and metatarsals. At that time, the doctor was of the opinion that it would become necessary to excise the bony prominence at the bases of the third and fourth metatarsals, and to surgically fuse the involved joints.
Plaintiff's condition remaining unchanged, he returned to the doctor's office December 3, 1957, when the suggested surgery was definitely determined upon and later performed February 5, 1958. Plaintiff returned for checkups February 14 and 28, 1958. On the latter date the sutures were removed and, although plaintiff was again using crutches, he was again advised to gradually increase weight bearing on his left foot. Recommended was a medial longitudinal arch and metatarsal bar to distribute weight bearing in the foot, so as to distribute a portion of the weight to a point just proximal to the metatarsal heads, so that all the pressure of weight bearing would not be placed on the metatarsal heads. Plaintiff was wearing these supports February 2, 1959, when seen by the doctor, who then concluded it might be necessary that the supports be worn permanently.
From the examination of February 2, 1959, the doctor found, and testified four days later, that, as a result of injuries sustained to plaintiff's foot, plaintiff experienced a seven percent disability to his body as a whole, or eighty-five percent disability to his foot and leg, which he characterized as total due to his inability to perform the duties of a roughneck, and which disability he estimated would continue for six months or possibly a year following the giving of his testimony.
Dr. Ray E. King, an orthopedist who examined plaintiff on behalf of defendant, indicated there was some disability, when he gave his testimony February 6, 1959, in plaintiff's foot, which he estimated from five to ten percent. He further indicated that his examination revealed some roughening or degenerative changes at the base of the third metatarsal, probably produced from trauma, and which he characterized as traumatic arthritis, as well as a degenerative change indicating a dying bone. Because of this, the doctor was of the opinion that it is entirely possible, at some later date, a fusion of that joint would need to be made.
Dr. Willis J. Taylor, also an orthopedist, examined plaintiff February 6, 1959, and expressed the opinion that plaintiff had reached maximum recovery, with a partial permanent disability of his left foot, probably not in excess of ten percent. He, nevertheless, was of the opinion that plaintiff could return to his former occupation as a roughneck.
Plaintiff was also examined by Dr. Joseph A. Thomas, a general practitioner of Natchitoches, February 10, 1959, only two days before trial of this case. The conclusion reached by him was that plaintiff was unable to return to work as a roughneck at that time. His conclusion was predicated, not only upon his physical findings as the result of his medical examination, but from his knowledge of the nature of the work of, and his experience in his premedical days as, a roughneck.
P. H. Coffey, who has over 30 years' experience as a roughneck and driller, testified it was essential that a roughneck have *614 good use of his feet, and, that as a driller, he would not employ plaintiff because of the injury to his foot.
From plaintiff's testimony, it clearly appears that he could not resume work as a roughneck and discharge the duties thereof without pain, inasmuch as such labor would require the shifting of his weight forward on the front portion of his foot.
We find no basis to disagree with the conclusion of the trial court that plaintiff is permanently and totally disabled to perform the duties of his former employment, or work of a similar character. Training and experience in the work is, without doubt, required of a roughneck.
It is well established that disability to do work of a reasonable character is deemed total whenever it appears that the injury causes total disability to continue carrying on the trade or work for which the employee is fitted by training and experience, or to do any work of a similar character. Reed v. Calcasieu Paper Company, Inc., 233 La. 747, 98 So.2d 175; Mottet v. Libbey-Owens-Ford Glass Co., 220 La. 653, 57 So.2d 218; Hughes v. Enloe, 214 La. 538, 38 So.2d 225; Ranatza v. Higgins Industries, Inc., 208 La. 198, 23 So.2d 45; Harper v. Crescent Drilling Company, Inc., La.App., 107 So.2d 553; Moore v. Great American Indemnity Company, La. App., 106 So.2d 771.
In Harper v. Crescent Drilling Company, Inc., supra, we recently held that where a roughneck was permanently and totally disabled, from the performance of the duties of his employment in which he was engaged at the time of his injuries, or work of a similar nature, he was entitled to recover compensation as for permanent and total disability.
Nor does the law expect and it does not contemplate that a laborer, in order to earn a living, must work in pain, or that he do so when it will materially increase, not only the hazards to his own health and safety, but also those of his fellow employees. Reed v. Calcasieu Paper Company, Inc., supra; Brannon v. Zurich General Accident & Liability Ins. Co., 224 La. 161, 69 So.2d 1; Carlino v. United States Fidelity & Guaranty Co., 196 La. 400, 199 So. 228; Stieffel v. Valentine Sugars, Inc., 188 La. 1091, 179 So. 6; Knispel v. Gulf States Utilities Co., Inc., 174 La. 401, 141 So. 9 Malone's Louisiana Workmen's Compensation, §§ 272-275.
Nor is it of any material importance, in making such an award, that the medical testimony may have disclosed only a percentage of disability of the body as a whole or to a particular member thereof. Professor Malone, in Louisiana Workmen's Compensation, § 278, 1960 Pocket Part, pages 97-98, makes this appropriate comment:
"Where the physical injury has an appreciable effect on the worker's capacity to discharge the operations performed by him prior to the accident, or where it results in substantial pain, the medical estimate of a percentage disability will be rejected, and compensation for total disability will be awarded. This is particularly true where the injury is not to an extremity, but is one which basically affects the motions of the entire bodyas in the case of back injuries. This problem is adequately discussed in Strother v. Standard Accident Ins. Co. [La.App., 63 So.2d 484], and Watson v. Floyd Electric Co. [La.App., 75 So.2d 361]. In the latter case the court observed:
"`* * * A twenty percent disability may have the effect of reducing a worker's earning power seventy-five percent. Therefore a five percent, ten percent, or fifteen percent back injury may reduce a laborer's earning capacity seventy-five percent. Total and permanent disability under the compensation law is not measured by the percentage of an injury producing disability.'" (Emphasis supplied.)
*615 We find no basis or reasons to disturb the judgment as regards the allowance for medical expenses. Both Drs. Simonton and King were of the opinion plaintiff would be able, within a period of time, to resume his former occupation. Nor do we find any reason or basis upon which penalties and attorney's fees may be awarded. From our review of the record, we do not find, and plaintiff does not point out, wherein the failure to pay, or to continue the payments of compensation, was arbitrary, capricious, or without probable cause.
Defendants contend, however, that plaintiff's principal endeavor is that of a student in college, employed as a roughneck only temporarily during the vacation months and that, by reason of the accident, plaintiff has sustained no disability whatsoever as pertains to such principal occupation.
That the factual basis for this contention is established is subject to considerable doubt. For a period of time, extending from November, 1955, to July, 1956, plaintiff was employed in offshore drilling operations in South Louisiana. During August, 1956, he was engaged in similar employment at Rodessa, Louisiana. This employment was followed by his matriculation at Louisiana State University for the session of 1956-1957. He did, however, enter Northwestern State College in September, 1957, but, due to surgery made necessary by the accident, plaintiff did not, however, complete the fall semester and did not begin the spring semester. He returned to college for the session of 1958-1959 and was a student at Northwestern State College when this case was tried. Even if the factual basis for the contention should be conceded, the contention is nevertheless untenable because, in such an event, plaintiff would be classified as a casual employee engaged in the performance of services in the course and scope of his employer's hazardous trade, business, and occupation.
Quoting from Malone's Louisiana Workmen's Compensation, page 57, § 55:
"The term `casual employment' has been so variously defined under the different workmen's compensation laws that it must be regarded as a word of art whose meaning is to be derived from the particular statute under consideration. The accepted dictionary treatment of the term defines it as `happening without design and unexpectedly, coming without regularity, occasional.' When so viewed the casualness of the employment relates to its unstable duration in point of time. Most compensation acts, however, do not exclude an employment merely because of its uncertainty in this respect so long as it is a part of the employer's regular business. It is generally required that the employment be both temporary in duration and also divorced from the regular calling of the employer if it is to escape coverage. Consequently the term `casual' as designating an employment excluded from the statutes has come to signify both the notion of irregularity of duration and the notion of being separate from the regular business of the employer.
"The statutes of Alaska, Kansas, Louisiana, Michigan, New York, Oklahoma, Oregon and Washington make no mention of casual employment. The Louisiana Act [LSA-R.S. 23:1021 et seq.], like most of these above, applies only to employments in the course of the employer's trade, business or occupation. If, however, the work of the employee is a part of the employer's regular business, the employment is covered under our Act despite the informality of the contractual arrangement and the short duration of the period of employment. The term, `casual employment,' insofar as it has been employed by our courts, is used in connection with the temporary character of the relationship and, as such, casual employments have been held expressly to fall within the protection of the statute: * * *"
*616 See, also Langley v. Findley, 207 La. 307, 21 So.2d 229, 231; Ranson-Rooney v. Overseas Ry., Inc., 17 La.App. 205, 134 So. 765, 769.
In the latter of these cases, it was stated:
"But in this state casual employees are not excluded from the benefits of the Compensation Law, and we are aware of no decision of our courts which has denied recovery upon the ground that the employment was casual and temporary. See, also, Baltimore & O. S. W. R. Co. v. Burtch, 263 U.S. 540, 44 S.Ct. 165, 68 L.Ed. 433."
In the former case, the Supreme Court made this observation:
"There is no contention that Langley was a casual employee. However, if such a contention were advanced, it appears that our Workmen's Compensation Statute covers casual employment." [207 La. 307, 21 So.2d 231.]
Lastly, defendants contend that plaintiff's disability, at most, was only temporary in character. While there is some testimony tending to support that view, the preponderance of the testimony does not justify that conclusion. Certain it is, plaintiff, at the time of trial, was totally and permanently disabled from resuming the duties of his former occupation. Such is the gist of Dr. Simonton's conclusions. His expressed opinion was that the condition of plaintiff's foot may require that the arch support and longitudinal metatarsal bar be worn permanently. The purpose of these supports was to distribute the pressure of weight upon the foot and to relieve the heads of the metatarsals sustaining fractures of as much pressure and weight bearing as possible.
From the doctor's testimony, it appears problematical and indefinite when recovery would enable plaintiff to return to the work in which he formerly engaged, or to work of a similar character. In reaching this conclusion, we are not unmindful of the doctor's statement that plaintiff's disability would continue for six months or more, or for twelve months or longer following the taking of his testimony shortly preceding the trial. The general rule is that, where a claimant for workmen's compensation is shown to be totally disabled at the time of trial and the evidence is insufficient to determine the duration of disability, compensation should be awarded for the maximum period of time prescribed for permanent, total disability, as the courts will not indulge in conjecture or attempt to fix the number of weeks for which compensation shall be payable where it appears the injury will produce disability for an extended and indefinite period of time. Moore v. Great American Indemnity Company, La.App., 106 So.2d 771, 775. See, also, the authorities therein cited. If, and whenever thereafter, disability ceases, the employer and its surety are authorized by statute to seek a modification of the judgment. They are, therefore, fairly and reasonably protected against imposition. Malone's Louisiana Workmen's Compensation, page 354, § 280.
In support of their aforesaid contention, the defendants cite Guillory v. Southern Farm Bureau Casualty Insurance Company, 237 La. 374, 111 So.2d 314, 317. There, plaintiff sustained a ligamentous tear and injury to the soft tissues of his foot. While X-rays revealed deformities in the lower bone structure of the foot, these deformities, as stated by the court,
"* * * were probably of long standing, evidently emanating from an injury predating the accident * * *."
In this case, the disabling effects, notably the fractures to the heads of the metatarsals, will probably extend over a prolonged and indefinite period of time, the duration of which was not, and most likely could not have been, established by evidence.
It is a firmly-established rule in the jurisprudence of this State that the findings *617 of the trial court upon questions of fact are entitled to great weight, and that, when only issues of fact are involved, such as are the issues in the instant case, it is incumbent upon the appellants, in order to secure a reversal of the decision from which they have appealed, or of which they complain, to show manifest error in the judgment. Dane v. Canal Insurance Company, La.App., 116 So.2d 359, and the authorities therein cited. This rule is appropriate to the judgment, not only as regards penalties and attorney's fees, of which plaintiff complains, but to the judgment on the merits, of which defendants complain. No such showing is made by either party.
For the aforesaid reasons, the judgment appealed should be, and, it is hereby, affirmed at appellants' cost.
Affirmed.